RENDERED: JUNE 20, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0322-DG

FRATERNAL ORDER OF POLICE,                           APPELLANTS
LODGE #4 AND CHRISTOPHER
MORROW


V.
              ON REVIEW FROM COURT OF APPEALS
                           NO. 2022-CA-0185
             FAYETTE CIRCUIT COURT NO. 20-CI-01368


LEXINGTON-FAYETTE URBAN                             APPELLEE
COUNTY GOVERNMENT


**OPINION OF THE COURT BY CHIEF JUSTICE LAMBERT**

**<u>REVERSING AND REMANDING</u>**

Christopher Morrow and Fraternal Order of Police, Lodge #4 (the Lodge) appeal a ruling of the Court of Appeals that affirmed a Fayette Circuit Court order of summary judgment in favor of Lexington-Fayette Urban County Government (LFUCG). Both the circuit court and Court of Appeals determined that LFUCG was not required to arbitrate a dispute concerning the meaning and application of a provision of the parties' collective bargaining agreement (CBA). Upon review, we reverse and remand for further proceedings consistent with this Opinion.

## I. FACTS AND PROCEDURAL BACKGROUND

In 2017, Christopher Morrow was employed by LFUCG as a sergeant with the Lexington Police Department. Morrow was a member of the Lodge, a labor and employment union. In July 2016, LFUCG and the Lodge entered into a CBA concerning the wages, hours, and working conditions of certain Lexington Police Department officers, including sergeants.

Pertinent to the dispute herein, Article 11 of the CBA provided the parties' agreed upon grievance and arbitration procedures. Section 1 of Article 11 stated that "[a]ny controversy between [LFUCG] and the Lodge concerning the meaning and application of any provisions of this Agreement shall be adjusted in the manner set out below." Section 2 then laid out a five-step grievance procedure. Steps one through four required the Lodge to first present the alleged aggrieved event to the officer's immediate supervisor followed by the bureau commander, the chief of police, and finally the mayor. Step five, "Arbitration," stated that "[i]f the Lodge is not satisfied with the answer obtained in Step 4, it may. . . seek arbitration[.]" Pursuant to the CBA, any decision rendered by an arbitrator is advisory rather than binding. Finally, Article 11 states that "[t]he grievance procedure contained in the Collective Bargaining Agreement is the sole and exclusive means of resolving all grievances arising under this [CBA]."

Article 19 of the parties' CBA is entitled "Legal Protection" and states in pertinent part:

> [LFUCG] shall provide for the defense of a Member in any action in tort arising out of an act or omission occurring within the scope of

2

his employment. A member shall be represented by the Department of Law [or] private counsel employed through the Department of Law. . . when a claim is made against him as an individual for money damages, for personal injury, or property damages resulting from the good faith performance of his official duties.

. . .

[LFUCG] may refuse to pay judgment or settlement in any action against a Member, or if [LFUCG] pays any claim or judgment against any Member. . . it may recover from such Member the amount of such payment and the costs to defend if it determines that. . .

    B. the action was outside the actual or apparent scope of his employment[.]

In early 2017 Kellie Jo Bell, an acquaintance of Morrow's, accused him of physically and sexually assaulting her. In April 2017, Bell gave a recorded statement to Lexington Police Lieutenant Ann Welch in which Bell claimed that on March 20, 2017, Morrow came to her home after his physical therapy appointment, dressed in jeans and a t-shirt, and talked to her about his daughter and mother. She stated that after their conversation was over she saw him to the door, and he tried to kiss her. Bell alleged that when she rejected this advance Morrow carried her to the couch, pinned her down, and choked her causing her to lose consciousness. And, when she regained consciousness, Morrow was digitally penetrating her.

In September 2017, Morrow was indicted for one count of first-degree rape in relation to the March 20, 2017, incident. In March 2018—six months after Morrow's indictment but prior to the resolution of his criminal charge—Bell filed a civil complaint against Morrow, LFUCG, and others in Fayette

3

Circuit Court.[1]  Despite Bell's previous statement to Lt. Welch that Morrow came to her home from a physical therapy appointment, that they discussed personal matters, and that he was not in uniform, her civil complaint alleged

> [t]hat on or about March 20, 2017, Christopher Morrow, while in the scope and course of his employment with LFUCG and the Division of Police, under the supervision and hire of the other defendants herein, and while in uniform, contacted the plaintiff using his police authority to enter her house at which time he sexually assaulted, battered and assaulted, physically and mentally abused and raped the plaintiff.

Bell's complaint solely alleged misconduct by Morrow on March 20, 2017, and did not assert that Morrow committed any tortious or criminal conduct against her on any other date.

Pursuant to Article 19 of the parties' CBA, Morrow requested that LFUCG provide him defense counsel against Bell's civil suit.  LFUCG sent Morrow a letter in response granting his request for legal representation.  The letter informed Morrow that LFUCG had retained Hon. Charles Cole to represent him, but further informed him that it would be providing his defense under a reservation of its rights pursuant to both Article 19 of the CBA and LFUCG's self-insurance policy.[2]

---

[1] *Kellie Jo Bell v. Lexington-Fayette Urban Cty. Gov't, et al.*, No. 18-CI-00982.

[2] In pertinent part, the self-insurance policy provides coverage for "occurrences" defined as "an accident or any happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury or damage to property during the policy period."

The policy further provides "police liability" coverage for sums "which the Assured shall become legally obligated to pay as damages because of claims for false arrest, assault and battery, false imprisonment, malicious prosecution, false or improper service of process, or other claims arising out of the performance of the duties of law enforcement officers employed by the Assured."

On December 2, 2019, Morrow filed a motion for re-arraignment in the criminal proceedings. That motion was granted, and Morrow entered a guilty plea to the amended charge of second-degree official misconduct. The factual basis for Morrow's guilty plea was not his alleged sexual assault of Bell on March 20, 2017. Rather, it was based on an allegedly consensual sexual encounter that occurred on February 2, 2017, between Morrow and Bell at her home.[3] Morrow explained in a post-guilty plea interview with the Lexington Police Department's Public Integrity Unit that he was on duty during the February 2, 2017, sexual encounter with Bell, but he was off duty during the March 20, 2017, encounter. He maintained that both incidents were consensual. Morrow's timesheet from March 20, 2017, further confirmed that he was not on duty that day.

The Lodge and Morrow claim that on March 12, 2020, Morrow's attorney in the Bell litigation, Mr. Cole, told Morrow's criminal defense attorneys that LFUCG intended to abandon his defense in the Bell litigation by filing a declaration of rights in circuit court. Based on their alleged receipt of this information, the Lodge and Morrow filed a grievance with LFUCG on or about March 16, 2020. The "Description of Grievance" section of the grievance form stated in its entirety:

---

Finally, the policy states it does not apply "to liability of any Assured for assault and battery committed by or at the direction of such Assured except liability for Personal Injury or Death resulting from any act alleged to be assault and battery for the purpose of preventing injury to persons or damage to property."

[3] This Court does not have the benefit of the full record of Morrow's criminal proceedings.

On March 12, 2020, Sgt. Morrow and the FOP were notified that LFUCG had communicated **the intent** to file a Declaration of Rights Complaint seeking a declaratory judgment from the Fayette Circuit Court **attempting to terminate** LFUCG's contractual obligation to provide legal protection to Sgt. Morrow in Bell v. Morrow, et al, 18-CI-982, Fayette Circuit Court.  LFUCG's breach **will violate** the specific terms of the CBA, including the obligation to provide a legal defense to all Members and the requirement to resolve all disputes through the grievance process.

Under the terms of the CBA, LFUCG "shall provide for the defense of a Member in any action in tort arising out of an act or omission occurring within the scope of his employment."  Numerical paragraph 8 of the [Bell] Complaint, filed in Fayette Circuit Court, alleges, "That on or about March 20, 2017, Christopher Morrow, while in the scope and course of his employment with LFUCG and the Division of Police."  Further, any disputes regarding the interpretation and meaning of the CBA must follow the grievance procedures.  LFUCG and the FOP collectively bargained for this Member benefit and grievance procedure which are reflected in the plain language of the CBA.

(Emphasis added).  The "Remedy Requested" section of the grievance requested the following:

1) Cease and desist with all activities **intended to violate** the terms of the CBA regarding LFUCG's obligation to provide a legal defense to Sgt. Morrow; 2) Compliance with the CBA's mandatory requirement to resolve all disputes, including contract interpretation disputes, under the CBA's grievance procedures; 3) Attorney's fees and costs incurred for the enforcement of the CBA's terms; and 4) All other remedies to make the [Lodge] and Sgt. Morrow whole.

(Emphasis added).  But, at the time the grievance was filed, LFUCG was providing Morrow with defense counsel in the Bell litigation, which had not yet reached a settlement or jury verdict.  LFUCG had not filed a declaration of rights action, nor had it filed a motion to withdraw Morrow's counsel in the Bell litigation.  Accordingly, on March 27, 2020, LFUCG denied the grievance on the grounds that it was premature.  Its denial letter explained:

The grievance does not assert any actual controversy but is prospective in nature as it seeks to prevent the LFUCG from seeking a declaration of its rights to withdraw its defense of Sgt. Morrow in this pending matter. That civil action was filed by Kellie Jo Bell on 3/16/2018.

. . .

After he was served with that Complaint, Sgt. Morrow requested representation from the LFUCG and in response, the LFUCG retained attorney Charles Cole . . . to represent Sgt. Morrow under a reservation of rights. To date, Mr. Cole continues to represent Morrow in the civil action.

. . .

Sgt. Morrow does not grieve an actual withdrawal of a defense or coverage by the LFUCG but, instead, an alleged communication that the LFUCG intended to file a Declaration of Rights terminating its obligations to defend and indemnify him. At this time, Sgt. Morrow is being defended by Mr. Cole who is paid by the LFUCG and there is no judgment or settlement which Morrow is legally obligated to pay. Therefore, there is no actual controversy and the grievance is denied on that basis.

Roughly one month after LFUCG denied the grievance, the Lodge and Morrow filed a civil complaint against LFUCG to compel arbitration. At the time the complaint was filed, LFUCG was still providing Morrow with a defense in the Bell litigation and had not taken any legal action to attempt to cease providing that defense. The sole count asserted in the complaint was that "LFUCG violated and materially breached the CBA by refusing to arbitrate Sgt. Morrow's grievance." In response, LFUCG filed a combined answer and counterclaim. LFUCG's answer asserted, *inter alia*, that "Plaintiffs' Complaint should be dismissed because it seeks prospective relief regarding actions that the Defendant has not yet taken." LFUCG did not file a motion to dismiss the Lodge and Morrow's complaint, but it did file a counterclaim.

7

LFUCG's counterclaim, which it believed was compulsory,[4] sought a declaration of its rights under the CBA. The counterclaim acknowledged that "[t]here [was] an actual controversy" between the Lodge and Morrow and LFUCG "regarding the interpretation of both the CBA and the Self Insurance Policy[.]" LFUCG sought "a declaration that it [had] no obligation to defend or indemnify [Morrow] for any of the allegations" asserted against him in the Bell litigation on the basis that he was acting outside the scope of his duties as a police officer during the alleged sexual assault on March 20, 2017. LFUCG also sought to recoup "its attorney fees and costs herein expended" and "all other relief to which it may be entitled."

Morrow and the Lodge filed a motion to dismiss LFUCG's counterclaim. Following a hearing, the circuit court issued an oral ruling denying the motion to dismiss. The court clarified that, while it was not ruling in LFUCG's favor on the merits, it was uncomfortable granting the motion to dismiss at that juncture given the numerous factual disputes the parties had raised during the hearing. The court later issued a written order memorializing its ruling, which contained no fact finding or legal analysis.

Several months later, the parties filed competing motions for summary judgment. LFUCG's motion argued that there were no issues of material fact

---

[4] Kentucky Rule of Civil Procedure (CR) 13.01 ("A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.").

regarding whether Morrow was entitled to coverage under LFUCG's self-insurance policy nor were there any issues of material fact regarding LFUCG's duty to arbitrate its obligations to Morrow in the Bell litigation. The basis for both arguments was the undisputed fact that Morrow was not on duty the day of Bell's alleged assault. Accordingly, it asserted, his actions did not occur within the scope of his employment, and it had no duty to defend him pursuant to Article 19 of the CBA or its self-insurance policy. It requested that the circuit court enter summary judgment declaring that it had neither a duty to defend and indemnify Morrow in the Bell case nor did it have a duty to arbitrate that issue under the CBA. It further asked for reimbursement from Morrow and/or the Lodge for the costs and attorney's fees it had incurred in the Bell litigation.

On the other side, Morrow's and the Lodge's motion for summary judgment argued they were entitled to a ruling in their favor pursuant to KRS[5] 67A.6908(3)[6] because LFUCG violated the CBA by refusing to arbitrate their grievance. They further asserted that the parties' factual dispute as to whether Morrow's actions were within the scope of his employment must be submitted to arbitration because the parties had agreed to a grievance and arbitration procedure under Article 11 of the CBA regarding "any controversy" concerning

---

[5] Kentucky Revised Statute.

[6] That statute directs that "[s]uits for violation of agreements between an urban-county government and a labor organization representing police officers. . . may be brought by the parties to the agreement in the Circuit Court of the urban-county government."

"the meaning and application of" the CBA. As for LFUCG's self-insurance policy, they asserted it had no bearing on the issue of LFUCG's duty to arbitrate under Article 11 of the CBA nor its duty to defend under Article 19. The CBA contained no reference to the self-insurance policy and accordingly, they contended, the Lodge never agreed to the policy having any bearing on LFUCG's duty to defend its officers or its duty arbitrate controversies arising under the CBA.

On the same day that the circuit court held a hearing on the parties' motions for summary judgment, Bell settled her civil suit against Morrow for $5,000. LFUCG represents to this Court that it paid that settlement amount on Morrow's behalf. In a subsequent order entered in the underlying case, the circuit court denied Morrow's and the Lodge's motion for summary judgment, granted LFUCG's motion for summary judgment, and ruled that LFUCG was entitled "to recover the costs and attorney's fees for [its] defense and indemnity of Morrow." As to the issue of whether LFUCG's initial refusal to arbitrate constituted a breach of the CBA, the circuit court noted that there was no longer a live controversy due to the Bell litigation being settled with prejudice. Nevertheless, it went on to find:

> Morrow was represented by counsel appointed by LFUCG during the Bell case. Therefore, LFUCG has provided a defense to Morrow which satisfies any potential obligation of LFUCG under the terms of the CBA. Further, and in the alternative, the Court finds that Morrow does not have a viable grievance with LFUCG per the CBA because LFUCG did not withdraw its defense of Morrow. . . Therefore, there was no "grievable event" to which the CBA [applied], nor which [triggered] the obligation to arbitrate.

10

The circuit court went on to reject the Lodge's and Morrow's contention that whether Morrow's alleged acts occurred within the scope of his employment was a dispute concerning the meaning and application of Article 19 of the CBA and therefore had to be submitted to arbitration. In addition, the court agreed with LFUCG's contention that Morrow's conduct fell outside the scope of covered "occurrences" under LFUCG's self-insurance policy. It found:

> It is not disputed that Morrow had taken a vacation day on March 20, 2017, which was the day the criminal conduct took place with Bell. As determined by the Kentucky Court of Appeals, an officer who was involved in an accident while operating a police squad car but was off-duty, not in uniform and not responding to a call was not entitled to indemnity nor a defense from his employer pursuant to the language of KRS 65.2005(3) and the department's CBA. [*Louisville Jefferson Cty. Metro. Gov't v. Braden*, 519 S.W.3d 386, 389 (Ky. App. 2017)]. It is uncontroverted that Morrow was not on duty that day nor was he performing any "realizable police action" at the time he went to Bell's home. Further, LFUCG has no interest in or right to govern Morrow's conduct at issue which further indicates that LFUCG is not obligated to defend or indemnify Morrow pursuant to the self-insurance policy. Additionally, several of the allegations against Morrow, assault and battery, are explicitly excluded from coverage under the policy. Therefore, Morrow is not covered by the self-insurance policy and LFUCG is subsequently (sic) not obligated to defend or indemnify Morrow.
>
> Similarly, Morrow's conduct is not covered by the terms of the CBA's coverage policy. Pursuant to the language of the CBA, LFUCG must provide a defense for only "any action in tort arising out of an act or omission occurring *within the scope of his employment [and] resulting from the good faith performance of his official duties.* (Emphasis added). It is a condition precedent that the employee's conduct be within the scope of the CBA before LFUCG would be obligated to defend or indemnify a FOP member employee like Morrow.

The court further found that LFUCG was entitled "to recover costs associated with indemnifying Morrow and providing a defense to him in the Bell case."

11

LFUCG subsequently filed a motion for the circuit court to approve the attorney's fees it incurred in the Bell litigation totaling $22,848.78. The following day, Morrow and the Lodge filed a motion to alter, amend, or vacate the court's summary judgment order pursuant to CR 59.05. The motion challenged each of the circuit court's rulings, and with regard to the court's award of attorney's fees in particular, it asserted *inter alia* that pursuant to the language of Article 19 of the CBA, the phrase "costs to defend" did not include "legal fees."

The circuit court ultimately denied the motion to alter, amend, or vacate, save for its challenge to the circuit court's award of attorney's fees to LFUCG. The court's order explained that it "[agreed] that the particular request for reimbursement and award of attorney's fees and costs does create a grievable controversy under the [CBA]. Therefore, this issue, and this issue alone, does appear to be one that should be first addressed by the parties through the CBA's arbitration procedures." It accordingly ordered the parties to submit to arbitration. The arbitrator later concluded that "the words 'costs to defend' include all such costs, including attorney's fees.'" Following the arbitrator's ruling, LFUCG again submitted a motion in circuit court for the approval of its attorney's fees in the Bell litigation, which was granted.

Morrow and the Lodge thereafter appealed to the Court of Appeals, which affirmed the circuit court. *Fraternal Order of Police, Lodge #4 v. Lexington-Fayette Urban Cty. Gov't,* 2022-CA-0185-MR, 2023 WL 3134658 (Ky. App. Apr. 28, 2023). The Court of Appeals highlighted that "the question of

12

arbitrability—whether a [CBA] creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination." *Id.* at *3 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). Based upon this, it concluded that because the circuit court found that the parties' dispute fell outside the scope of the CBA, and was therefore not arbitrable, it was within its authority to rule on the merits of the disagreement. *Id.* at *4. And, ostensibly, it agreed with the circuit court's ruling that "the CBA was not implicated in this case because Morrow's illegal activities occurred when he was off-duty[.]" *Id.* For whatever reason, the Court of Appeals did not address whether LFUCG's refusal to arbitrate the Lodge's initial grievance constituted a breach of the CBA.

The Court of Appeals noted that, because the circuit court found the CBA was inapplicable to the parties' dispute, it was unnecessary to submit to arbitration the issue of whether "costs to defend" under the CBA included attorney's fees. *Id.* Nevertheless, it rejected Morrow's and the Lodge's argument that LFUCG's counterclaim had not properly pled its entitlement to attorney's fees expended in the Bell litigation based on LFUCG's counterclaim requesting "any other relief" to which it may have been entitled. *Id.*

This Court subsequently granted the motion for discretionary review of the Court of Appeals' opinion filed by Morrow and the Lodge.

13

## II. ANALYSIS

### A. Applicable Case Law

Prior to addressing the merits of the issues presented, it is crucial to first enumerate the binding state and federal precedents that are applicable thereto.

In 1960 the U.S. Supreme Court issued three opinions that became colloquially known as "the Steelworkers Trilogy": *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574 (1960); and *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (1960). These seminal cases in the area of labor law and arbitration established principles regarding the enforceability of arbitration agreements, the role of arbitration in resolving labor disputes, and, significant to our purposes, the role the judiciary is permitted to play in refereeing those disputes. Twenty-six years later, in *AT&T Techs.*, the U.S. Supreme Court reaffirmed the standards it previously established in the Steelworkers Trilogy and summarized those standards as follows:

> The first principle gleaned from the *Trilogy* is that arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit . . . This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration. . .
>
> The second rule, which follows inexorably from the first, is that **the question of arbitrability—whether a [CBA] creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination**. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator. . . The duty to arbitrate being of contractual origin, a

14

compulsory submission to arbitration cannot precede judicial determination that the [CBA] does in fact create such a duty.

The third principle derived from our prior cases is that, **in deciding whether the parties have agreed to submit a particular grievance to arbitration**, **a court is not to rule on the potential merits of the underlying claims**. Whether "arguable" or not, indeed **even if it appears to the court to be frivolous**, the union's claim that the employer has violated the [CBA] is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator. **The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious**.

Finally, it has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

475 U.S. at 648-50 (emphasis added) (internal citations and quotation marks omitted).

The Commonwealth's jurisprudence in this area of the law is somewhat scant. Nevertheless, in *United Brick & Clay Workers of Am., Local No. 486 v. Lee Clay Prods. Co., Inc.*, our then-highest Court stated unequivocally that "the principles of federal substantive labor law are controlling. . . even though the matter is litigated in state court." 488 S.W.2d 331, 334 (Ky. 1972). In that case, the employer operated clay mining and manufacturing facilities and intended to wind down and cease its operations. *Id.* at 332. The employer and the union had a previously existing CBA (Original Agreement), but in

15

anticipation of the employer's gradual discharge of its employees the parties entered into a supplemental CBA (Closure Agreement). *Id.* The Closure Agreement stated that the Original Agreement would remain in effect until August 1, 1971, except for the "seniority and layoff provisions" which where "cancelled and deleted," and replaced by the provisions in the Closure Agreement. *Id.* at 333.

Pursuant to the layoff schedule in the Closure Agreement, thirty-nine employees were laid off prior to Thanksgiving Day 1970 and twenty-four were laid off prior to Christmas Eve 1970. *Id.* Despite the Original Agreement identifying both holidays as being paid holidays, none of the dismissed employees were paid for them. *Id.* The union demanded that the workers be paid, but the employer rejected the demand under a different provision of the Original Agreement which required an employee to work the first regularly scheduled work day immediately following a paid holiday in order to be paid for that holiday. *Id.* The union's demand to submit the dispute to arbitration was likewise denied by the employer based on its assertion that the dispute was not subject to arbitration under the Original Agreement, which stated that the arbitration of disputes "shall not apply to matters. . . involving changes in, or termination of this agreement." *Id.*

The union unilaterally contacted an arbitration association to initiate arbitration proceedings, causing the employer to file an injunction in circuit court. *Id.* The circuit court found that the issues were not arbitrable because they involved "changes in or the termination of" the Original Agreement; it

16

entered summary judgment in the employer's favor and entered its requested injunction. *Id.* The union appealed the ruling, and our then-highest Court reversed and remanded with instructions to dissolve the injunction and dismiss the employer's complaint. *Id.* at 336.

The *United Brick* Court made it clear from the outset that it "[did] not believe the matters in dispute involve changes in or the termination of the [CBA,]" but rather "the right of discharged employees to holiday and vacation pay under the terms of the Original Agreement[,]" which was still in effect during the holidays at issue. *Id.* at 333-34. Nevertheless, the Court recognized that the Steelworkers Trilogy required it to exercise "judicial deference to arbitration and judicial restraint, prior to arbitration, from intervention into the interpretation of the provisions of [CBAs] which provide for arbitration." *Id.* at 334. *United Brick* emphasized that "the judicial deference and restraint established by federal policy extend so far as to require the submission to arbitration of patently baseless claims." *Id.* In support, it discussed that in *Am. Mfg.*, the first case in the Steelworkers Trilogy, the U.S. Supreme Court reversed the Sixth Circuit's holding "that a grievance was not subject to arbitration because it was frivolous and patently baseless[,]"[7] and quoted favorably from a law review article on the subject which explained that

_____

[7] In *Am. Mfg.*, the employee received a ruling pursuant to a workers' compensation claim that he had a twenty five percent permanent partial disability rating. 363 U.S. at 564-65. Two weeks later, the union filed a grievance asserting the employee was entitled to return to work under a seniority provision in the parties' CBA. *Id.* at 565. The employer refused to arbitrate the grievance on the grounds that, *inter alia*, the employee's acceptance of the workers' compensation award estopped him from asserting the claim and because he was no longer physically able to do the

17

**[f]rivolous cases are often taken, and are expected to be taken, to arbitration**. What one man considers frivolous another may find meritorious, and it is common knowledge in industrial relations circles that grievance arbitration often serves as a safety valve for troublesome complaints. **Under these circumstances it seems proper to read the typical arbitration clause as a promise to arbitrate every claim, meritorious or frivolous, which the complainant bases upon the contract**. The objection that equity will not order a party to do a useless act is outweighed by the cathartic value of arbitrating even a frivolous grievance and by the dangers of excessive judicial intervention.

*Id.* at 334-35 (citing *Am. Mfg.*, 363 U.S. at 568 n. 6 (quoting Cox, *Current Problems in the Law of Grievance Arbitration*, 30 Rocky Mt. L. Rev. 247, 261 (1958))) (emphasis added).

The *United Brick* Court opined that "[t]hough it is difficult to follow as a concept of law. . . an issue must be submitted to arbitration even though under the provisions of the agreement only one interpretation is possible." 488 S.W.2d at 335 (citing *New Bedford Def. Prods. Div. of Firestone Tire & Rubber Co. v. Local No. 1113 of Int'l Union, United Auto., Aircraft and Agric. Implement Workers of Am. (UAW, AFL-CIO)*, 258 F.2d 522 (1st Cir. 1958)). Thus, it held that because the union claimed that the Original Agreement should be interpreted to allow holiday pay, and the employer interpreted the agreement in a manner that would deny the claim, "settlement of [the] dispute [would] require an interpretation of the provisions of the agreement[,]" and "**[f]ederal substantive law requires that that interpretation be made by an arbitrator**.

---

work. *Id.* at 564-65. The U.S. Supreme Court nevertheless reversed the lower courts' rulings that the employer was not required to arbitrate the grievance. *Id.* at 569.

18

. . **even though only one result is possible**." 488 S.W.2d at 335 (emphasis added).

So, to summarize, the directives this Court must apply in addressing the issues now before us are clear, albeit not entirely intuitive. First, as CBAs are a matter of contract, the judiciary cannot force a party to arbitrate any dispute which that party has not agreed to arbitrate. *AT&T Techs.*, 475 U.S. at 648 (quoting *Warrior & Gulf*, 363 U.S. at 582). Second, unless the parties' CBA clearly provides otherwise, it is within the judiciary's purview to determine whether the parties to a CBA agreed to arbitrate a particular dispute based on the language of the CBA. *AT&T Techs.*, 475 U.S. at 649 (citing *Warrior & Gulf*, 363 U.S. at 582-83). Third, in ruling on whether the parties to a CBA have agreed to arbitrate a dispute, a court is not permitted to address the potential merits of the dispute, it is not permitted to consider whether there is equity in a particular claim, and it is not permitted to determine if the language of the CBA would support the claim. *AT&T Techs.*, 475 U.S. at 649-50 (citing *Am. Mfg.*, 363 U.S. at 568); *United Brick*, 488 S.W.2d at 334-35. And, significantly to the case now before us, that tenet is applicable even if the claim made by the party seeking arbitration appears to be frivolous, patently baseless, or capable of producing only one result at arbitration. *Id.* Finally, if a CBA contains an arbitration clause, there is a presumption of arbitrability, and all doubts should be resolved in favor of arbitration. *AT&T Techs.*, 475 U.S. at 650 (quoting *Warrior & Gulf*, 363 U.S. at 582-83).

19

With the foregoing in mind, we now address the issues presented by this appeal.

**B. The circuit court correctly found that LFUCG did not breach the parties' CBA by refusing to arbitrate the grievance because the grievance failed to assert a controversy.**

Preliminarily, we must clarify what the grievance at issue asserted. During oral arguments on this matter and in its appellant brief to this Court, the Lodge contended that its grievance presented a "controversy" by challenging LFUCG's ability to defend one of its officers under a reservation of rights. This assertion is demonstrably false. As recounted in Section I of this Opinion, the plain language of the grievance only sought to prevent LFUCG from attempting to withdraw its defense of Morrow in the Bell litigation by filing a declaration of rights action. Nowhere in the grievance did the Lodge even mention that LFUCG was providing Morrow a defense under a reservation of its rights. Moreover, if that had been the actual basis for the grievance, the grievance would have been untimely. Article 11 of the CBA states that step one of the grievance procedure—oral presentation of the grievance to the grievant's immediate supervisor—must occur within fourteen days of the grieved event, and that the immediate supervisor must respond within seven days. LFUCG provided notice to the Lodge and Morrow that it was reserving its rights in its March 2018 letter accepting Morrow's request for representation, yet the grievance states that the date of the grieved event was two years later in March 2020.

20

With that established, we agree with the circuit court that the issue raised by the grievance is now moot. "[A] 'moot case' is one which seeks to get a judgment. . .upon some matter which, when rendered, for any reason, cannot have any practical legal effect upon a then existing controversy." *Morgan v. Getter*, 441 S.W.3d 94, 98–99 (Ky. 2014) (quoting *Benton v. Clay*, 233 S.W. 1041, 1042 (Ky. 1921)). The grievance sought to stop LFUCG from attempting to withdraw its defense of Morrow. LFUCG defended Morrow in the Bell litigation until it was settled and dismissed with prejudice and thereafter paid the settlement amount on his behalf. Thus, any ruling on the grievance cannot have a legal effect upon a presently existing controversy.

Nevertheless, we conclude that the circuit court did not err by finding that LFUCG's refusal to arbitrate the grievance did not breach the parties' CBA. As discussed, the question of arbitrability, i.e., whether a CBA creates a duty for the parties to arbitrate a grievance, is a question the courts are permitted to address unless the parties' CBA clearly provides otherwise. *AT&T Techs.*, 475 U.S. at 649. Article 11 of the parties' CBA states that they have agreed to submit any *controversy* concerning the meaning and application of the CBA to the grievance and arbitration process, but the Lodge's grievance clearly failed to present a controversy. The grievance sought to prevent LFUCG from filing a declaration of rights concerning its duty to defend Morrow in the Bell litigation and further sought to prevent LFUCG from withdrawing its defense of Morrow in that litigation. But, at the time the grievance was filed, LFUCG was providing a defense to Morrow and had taken no steps whatsoever to withdraw

21

that defense: it had not filed a declaration of rights, nor had it filed a motion to withdraw Morrow's defense counsel in the Bell litigation. Thus, there was no "controversy" to arbitrate, and LFUCG did not breach the CBA by denying the Lodge's request to do so on that basis.

To be clear, if, prior to the filing of the grievance (and assuming the grievance was properly worded), LFUCG had filed a declaration of rights challenging its duty to defend Morrow or if it had otherwise taken steps to withdraw Morrow's defense, it would have breached the CBA by refusing to first arbitrate those issues. This Opinion should in no way be interpreted to give employers carte blanche to decide when a grievance is arbitrable. Instead, under the specific facts of this case, we simply hold that: one, the circuit court had the authority to determine whether the parties had agreed to arbitrate the grievance, and two, the circuit court did not err by finding that the grievance was not arbitrable because it failed to present an actual controversy.

## C. LFUCG's counterclaim seeking a declaration of its rights created an arbitrable dispute under the CBA, and the circuit court erred by adjudicating the merits of that dispute.

As explained *supra*, there was no arbitrable controversy between the parties at the time the Lodge and Morrow filed their grievance. However, after LFUCG denied the grievance, the Lodge and Morrow filed a complaint in circuit court seeking to compel arbitration, and in response to that complaint, LFUCG filed a counterclaim seeking "a declaration of its rights. . . pursuant to [the CBA]. . .that it [had] no obligation to defend and indemnify [Morrow]" in the Bell litigation. We acknowledge that LFUCG believed this counterclaim to be

22

compulsory and therefore the Lodge and Morrow essentially forced its hand in filing its declaration of rights prior to the conclusion of the Bell litigation. Nevertheless, we conclude that when LFUCG filed its counterclaim for a declaration of its rights under the CBA, it created an arbitrable controversy under the CBA. We further conclude that the circuit court erred by ruling on the merits of that controversy instead of ordering the parties to first arbitrate it.

To begin, we note that unlike the issue presented by the grievance, this issue did not become moot upon the conclusion of the Bell litigation. Again, a moot case seeks a judgment that can have no practical legal effect on a then-existing controversy. *Getter*, 441 S.W.3d at 98-99. Here, whether LFUCG had a duty to defend Morrow will have a practical legal effect on a now existing controversy, namely: which party foots the bill for Morrow's defense and whether Morrow must indemnify LFUCG for its payment of the settlement in the Bell litigation.

Pursuant to both the language of the CBA and the Claims Against Local Governments Act (CALGA),[8] if LFUCG did not have a duty to defend Morrow, it may recoup the funds it expended in the Bell litigation on Morrow's behalf. Article 19 of the CBA provides that "if [LFUCG] pays any claim or judgment against any Member. . . it may recover from such Member the amount of such payment and the costs to defend if it determines that. . . the action was outside the actual or apparent scope of his employment." This tracks the language of

---

[8] KRS 65.200, *et seq.*

23

CALGA nearly verbatim, which directs, in relevant part, that "if a local government pays any claim or judgment against any employee . . . it may recover from such employee the amount of such payment and the costs to defend if. . . [t]he action was outside the actual or apparent scope of his employment[.]" KRS 65.2005(3)(b). But, by the same token, if LFUCG did have a duty to defend Morrow, it may not seek indemnification of those funds from him.

That noted, we reiterate that unless a CBA expressly provides otherwise, a court is permitted to determine whether the parties to that CBA agreed to arbitrate a particular dispute. *AT&T Techs.*, 475 U.S. at 649. But, in doing so, a court may not opine on the merits of that dispute even if the claim appears to the court to be frivolous and it appears that only one reasonable interpretation of the CBA, or result at arbitration of the dispute, is possible. *Id.* at 649-50; *United Brick*, 488 S.W.2d at 334-35.

In this case, Count One of LGUCG's counterclaim asserted that "[t]here is an actual controversy" between the parties "regarding the interpretation of the CBA" for which LFUCG sought "a declaration that it [had] no obligation to defend or indemnify [Morrow] for any of the allegations that have been asserted against him" in the Bell litigation. Similarly, Count Two stated that it brought the action "to resolve a dispute about its duty to defend and indemnify [Morrow] for the allegations made against him" in the Bell litigation. The basis for LFUCG's contention that it had no duty to defend Morrow was that Morrow was not on duty on the date of the assault alleged by Bell. The circuit court

24

agreed with that contention and ruled in its summary judgment order that, because Morrow was off duty on the date of the alleged assault, his actions were not covered by the CBA. It reasoned that "[i]t is a condition precedent that the employee's conduct be within the scope of the CBA before LFUCG would be obligated to defend and indemnify" Morrow.[9]

This Court does not dispute the circuit court's conclusion that Morrow's conduct had to be within the scope of his employment in order to entitle him to a defense and indemnification. But what is conspicuously absent from the circuit court's order is a threshold determination that the parties did not agree to arbitrate any dispute concerning whether Morrow's actions entitled him to a defense and indemnification. Whether LFUCG actually had a duty to defend Morrow and whether LFUCG agreed to first arbitrate any dispute regarding that duty are two entirely distinct inquiries.

Consequently, the first step in the circuit court's analysis should have been to explicitly address whether, pursuant to the CBA's language, the parties agreed to arbitrate the dispute before it. The dispute before it was whether Morrow's actions were within the scope of his employment despite the fact that he was off duty when those actions occurred, thereby triggering LFUCG's duty

---

[9] The circuit court relied on *Braden* to conclude that Morrow was not entitled to a defense or indemnity because his actions were outside the scope of his employment. But *Braden* did not address an effort by either party to compel arbitration of an issue pursuant to a CBA. 519 S.W.3d at 391-96. Rather, it addressed what is meant by "scope of employment" solely under CALGA. *Id.* at 392-95. Thus, while *Braden* remains good law, it is simply not applicable to the issues presented herein because it does not implicate our jurisprudence concerning bargained-for arbitration agreements between labor unions and employers.

25

to defend him under Article 19.  Although the Lodge's claim undoubtedly appears to be "patently baseless," "frivolous," and without merit, the mandates of both the U.S. Supreme Court's jurisprudence and our own unmistakably require a court to disregard that proverbial red herring and decide only whether the parties agreed to arbitrate the dispute.  *AT&T Techs.*, 475 U.S. at 649–50 (relying on *Am. Mfg.*, 363 U.S. at 568); *United Brick*, 488 S.W.2d at 334–35.

Article 11 of the parties' CBA declares that "*[a]ny* controversy between [LFUCG] and the Lodge *concerning the meaning and application* of *any* provisions of this Agreement shall be adjusted in the manner" set forth in the CBA's grievance and arbitration provisions.  The parties' dispute concerned the meaning and application of Article 19 of the CBA.  Indeed, LFUCG's own counterclaim acknowledged that "[t]here [was] an actual controversy" between the Lodge and Morrow and LFUCG "regarding the interpretation of" of the CBA.  But, instead of finding that LFUCG's counterclaim raised an arbitrable dispute and ordering the parties to arbitration, the circuit court ruled on the merits of the issue by finding that Morrow's actions were outside the scope of his employment.  This unmistakably violated the Steelworkers Trilogy and its progeny as well as *United Brick*.

Accordingly, we must reverse the Court of Appeals' opinion upholding the circuit court's summary judgment order in LFUCG's favor, and vacate that order insofar as it ruled that Morrow's conduct was not covered by the parties'

26

CBA.[10] As for the additional issue of attorney's fees, the circuit court's initial summary judgment order found that LFUCG was "entitled to cover costs associated with indemnifying Morrow and providing a defense to him in the Bell case." The circuit court later ordered arbitration on the issue of whether "costs to defend" under the CBA included attorney's fees, which was answered by the arbitrator in the affirmative. The circuit court accordingly entered an order requiring Morrow to reimburse LFUCG for its attorney's fees. But the circuit court's ruling was premised upon its finding that Morrow's actions were not within the scope of his employment under the CBA. As this Court must vacate that finding for the reasons already provided, we must also reverse the Court of Appeals' ruling that upheld that award and vacate the circuit court's order awarding attorney's fees to LFUCG.

On remand, the circuit court is directed to enter an order requiring the parties to arbitrate the issue of whether Morrow's alleged conduct against Bell was within the scope of his employment for LFUCG pursuant to Article 19 of the CBA. Once the arbitrator has issued his or her advisory opinion on that issue, the circuit court is to then issue an order on that issue as well as LFUCG's entitlement to attorney's fees it expended in the Bell litigation.

---

[10] As LFUCG's self-insurance policy was not incorporated into the parties' CBA, we agree with the Lodge and Morrow that coverage under the policy is a distinct issue from coverage under the CBA. Accordingly, the circuit court's finding that Morrow's actions were not covered by LFUCG's self-insurance policy shall not be affected by this Opinion.

27

## III.   CONCLUSION

We hereby reverse the Court of Appeals' opinion that upheld the circuit court's summary judgment ruling in favor of LFUCG and upheld the circuit court's award of attorney's fees to LFUCG.  The circuit court orders are hereby vacated only insofar as they ruled that Morrow's conduct was not covered by the CBA and ordered that Morrow reimburse LFUCG for its attorney's fees in the Bell litigation.  The circuit court's ruling that Morrow's conduct was not subject to coverage under LFUCG's self-insurance policy shall remain in effect. On remand, the circuit court shall order the parties to arbitrate the issue of whether Morrow's actions on March 20, 2017, and the circumstances surrounding those actions, entitled him to a defense and indemnification by LFUCG pursuant to the parties' CBA.  The circuit court shall thereafter provide a ruling on those issues.  The arbitrator's opinion shall be advisory and not binding on the circuit court.

All sitting.  Conley, Keller, Nickell and Thompson, JJ.; concur. Goodwine, J., dissents by separate opinion in which Bisig, J.; joins.

GOODWINE, J., DISSENTING:  We agree with the Majority's holding that the trial court correctly found LFUCG did not breach the parties' CBA because the grievance filed by Morrow and the Lodge did not assert a controversy.  We also recognize the significance of the U.S. Supreme Court's longstanding precedent in the Steelworkers Trilogy cases.  However, we must respectfully dissent on the Majority's reversal of the Court of Appeals for the parties to arbitrate whether Morrow was acting within the scope of his employment when

28

he allegedly sexually assaulted Bell on a day he was undisputedly off-duty. Any error the trial court committed by addressing the merits of this issue can only be described as harmless.

"No error . . . in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for . . . disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." CR 61.01. In determining whether an error is harmless, we must determine "whether the result probably would have been the same absent the error[.]" *CSX Transp., Inc. v. Begley*, 313 S.W.3d 52, 69 (Ky. 2010) (footnote omitted).

Here, the facts underlying the "arbitrable dispute" are not in dispute. Under the plain terms of Article 19 of the CBA, if LFUCG provides representation and/or pays a settlement on a member's behalf, "it may recover from such Member the amount of such payment and the costs to defend if it determines that . . . the action was outside the actual or apparent scope of his employment[.]" Morrow admitted, both before the Lexington Police Department's Public Integrity Unit and at every stage of this case, that he was not on duty on March 20, 2017. An arbitrator has previously determined "costs to defend" include "legal fees." The Majority has appropriately characterized the Lodge's claim as "undoubtedly . . . 'patently baseless,' 'frivolous, and without merit[.]" There is no reasonable probability that

arbitration will result in any outcome other than the determination that Morrow was not on duty and, as a result, is responsible for reimbursing LFUCG for the settlement and costs to defend him, including legal fees.

Furthermore, even if an arbitrator reached a different result, it is difficult to see how his or her advisory opinion would ultimately change the outcome of the case. "Advisory arbitration," like the procedure agreed to by the parties in this case, is "nonbinding arbitration resulting in a recommendation the parties are free to consider but not required to adopt." *River City Fraternal Ord. of Police Lodge 614, Inc. v. Louisville/Jefferson Cnty. Metro. Gov't*, 585 S.W.3d 258, 265 (Ky. App. 2019). It is not final or binding on the parties or the trial court. *Id.* at 265, 267. Considering the frivolous nature of the Lodge's claim, it is inconceivable that, even if an arbitrator somehow found Morrow was acting within the scope of his employment, the trial court would agree. Instead, we find that regardless of the arbitrator's decision, the trial court would decide the issue exactly as it did so previously.

Without any reasonable probability of a different outcome, vacating the trial court's orders and remanding this matter for arbitration of a frivolous issue can only be characterized as a waste of both judicial resources and those of the parties. For these reasons, we would affirm the trial court's orders and the Court of Appeals' decision.

Bisig, J., joins.

30

COUNSEL FOR APPELLANTS:

Scott Alan Crosbie
Eric Cashion Eaton
Crosbie Eaton Oleson PLLC


COUNSEL FOR APPELLEE:

Barbra Ann Kriz
Kriz, Jenkins & Prewitt, P.S.C.